---

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

**This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Joint Chapter 11 Plan of Reorganization of Times Square JV LLC. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under section 1125 of the Bankruptcy Code. This proposed Disclosure Statement is being submitted for approval only and has not yet been approved by the Bankruptcy Court.**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| TIMES SQUARE JV LLC, *et al.*[1] | Case No. 22-11715 (JPM) |
| Debtors. | (Jointly Administered) |

---

## DISCLOSURE STATEMENT FOR THE DEBTORS' PLAN OF REORGANIZTION UNDER CHAPTER 11 OF THE BANKRUPCY CODE

SEWARD & KISSEL LLP
John R. Ashmead
Robert J. Gayda
Catherine V. LoTempio
Andrew J. Matott
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Proposed Counsel to the Debtors and
Debtors in Possession*

December 28, 2022

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Times Square JV LLC (6123), CPTS Hotel Lessee LLC (6401), 1601 Broadway Holding LLC (3359), and 1601 Broadway Owner LLC (6463).  The mailing address for the Debtors is 15 East Putnam Avenue, Suite 406, Greenwich CT 06830.

## DISCLAIMER[2]

**THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ANNEXED HERETO, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO VOTE ON THE PLAN. NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.**

**ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO (I) READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES; (II) CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII; AND (III) CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO THIS DISCLOSURE STATEMENT, THE PLAN AND ALL ACCOMPANYING DOCUMENTS BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S). THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.**

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as may be amended, altered, modified, revised, or supplemented from time to time, the "***Plan***").

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.**

**THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (III) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT ARE PRESUMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) THE RELEASED PARTIES. A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS OF THE PLAN IS SET FORTH IN EXHIBIT 4 HERETO.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED USING THE BEST INFORMATION AVAILABLE TO THE DEBTORS AS OF THE DATE HEREOF REGARDING THE DEBTORS' ASSETS, LIABILITIES, AND AFFAIRS. TO THE EXTENT THAT BOOKS AND RECORDS PRODUCED TO THE DEBTORS AFTER THE DATE HEREOF IMPACT THE ESTIMATES REGARDING CREDITOR RECOVERIES UNDER THE PLAN OR THE OTHER DISCLOSURES HEREIN, THE DEBTORS SHALL PROMPTLY UPDATE THE DISCLOSURE STATEMENT AND FILE AN AMENDED VERSION ON THE BANKRUPTCY COURT'S PUBLIC DOCKET. ANY AMENDED DISCLOSURE STATEMENT WILL BE SERVED IN THE SAME MANNER AND ON THE SAME PARTIES AS THIS DISCLOSURE STATEMENT.**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................7

    A.    Purpose of the Disclosure Statement..............................................................7
    B.    Disclosure Statement Enclosures ...................................................................7
    C.    Final Approval of the Disclosure Statement and Confirmation of the Plan ...........8
    D.    Voting Procedures and Voting Deadline..........................................................8
    E.    Confirmation Hearing ...................................................................................10

II.   GENERAL INFORMATION REGARDING THE DEBTORS.................................10

    A.    The Debtors' Business ..................................................................................10

III.  THE DEBTOR'S CORPORATE STRUCTURE ....................................................15

    A.    The Debtors' Capital Structure .....................................................................15
    B.    Summary of Events Leading to the Debtors' Chapter 11 Filing.........................17

IV.   THE CHAPTER 11 CASES ..................................................................................20

    A.    Commencement of the Chapter 11 Cases .......................................................20
    B.    "First Day" Motions .....................................................................................20
    C.    Retention of Debtors' Professionals...............................................................21
    D.    Significant Events During the Chapter 11 Cases .............................................21
    E.    The Debtors' Employees and Collective Bargaining Agreements ......................22

V.    SUMMARY OF PLAN .........................................................................................22

    A.    Treatment of Claims.....................................................................................23
    B.    Means for Implementation of the Plan ...........................................................28

VI.   ACCEPTANCE AND CONFIRMATION OF THE PLAN.......................................28

    A.    General ........................................................................................................28
    B.    Parties Entitled to Vote ................................................................................28
    C.    Classes Impaired and Entitled to Vote under the Plan .....................................29
    D.    Voting Procedures and Requirements ............................................................29
    E.    Acceptance of Plan.......................................................................................30
    F.    Confirmation Without Necessary Acceptances; Cramdown...............................31

VII.  BEST INTERESTS AND FEASIBILITY TESTS ...................................................32

    A.    Best Interests Test ........................................................................................32
    B.    Feasibility ...................................................................................................32

VIII. EFFECT OF CONFIRMATION ............................................................................34

    A.    Binding Effect of Confirmation .....................................................................34

    B.       Good Faith ................................................................................................34

IX.     CERTAIN RISK FACTORS TO BE CONSIDERED ...............................................34

    A.       Certain Bankruptcy Factor Considerations .........................................34
    B.       Factors Impacting the Value of the Debtors .........................................36
    C.       Additional Factors ................................................................................37

X.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...........38

    A.       General ..................................................................................................38
    B.       Tax Consequences to U.S. Holders of Claims .....................................39
    C.       Tax Consequences to Non-U.S. Holders of Claims ............................40
    D.       Information Reporting and Backup Withholding .................................40
    E.       FATCA ..................................................................................................41

XI.     RECOMMENDATION AND CONCLUSION ........................................................41

]

## TABLE OF EXHIBITS

| Exhibit | Title |
| --- | --- |
| 1 | Joint Chapter 11 Plan of Reorganization |
| 2 | Restructuring Support Agreement |
| 3 | Liquidation Analysis |
| 4 | Release Provisions |

## I.    INTRODUCTION

### A.    Purpose of the Disclosure Statement

On December 28, 2022 (the "***Petition Date***"), CPTS Hotel Lessee LLC ("***CPTS***"), Times Square JV LLC ("***TSJV***"), 1601 Broadway Owner LLC ("***1601 Broadway Owner***") and 1601 Broadway Holdings LLC ("***1601 Broadway Holdings***" and collectively with CPTS, TSJV and 1601 Broadway Owner, the "***Debtors***" and each a "**Debtor**"))[3] filed voluntary petitions for relief (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").

The Debtors have filed the *Joint Chapter 11 Plan of Reorganization* (including all exhibits thereto, and as may be amended, altered, modified or supplemented from time to time, the "***Plan***") with the Bankruptcy Court. A copy of the Plan is attached hereto as <u>**Exhibit 1**</u>.

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan; *provided, however*, that any capitalized term used herein that is not defined herein or in the Plan but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") has the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

The Debtors submit this disclosure statement (as may be amended, altered, modified or supplemented from time to time, the "***Disclosure Statement***") pursuant to section 1125 of the Bankruptcy Code to Holders of certain Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan and (ii) the Confirmation Hearing.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to Creditors who will have the right to vote on the Plan so that they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a ballot with this Disclosure Statement for purposes of voting on the Plan.

This Disclosure Statement includes information about the Debtors' prepetition business operations, financial history, the events leading to the filing of the Chapter 11 Cases. This Disclosure Statement also includes an overview of the Plan that describes certain provisions of the Plan, the effects of Confirmation of the Plan, risk factors associated with the Plan and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

### B.    Disclosure Statement Enclosures

**Accompanying this Disclosure Statement are:**

1.    <u>Order Approving the Disclosure Statement.</u> A copy of the Bankruptcy Court's order (the "***Solicitation Procedures Order***") approving this Disclosure Statement, establishing procedures

---

[3]    The term "Debtors" shall refer to the Debtors that filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 and the term "Chapter 11 Cases" shall refer to the chapter 11 cases of the Debtors that filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.    Ballot. A ballot (the "***Ballot***") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "***Voting Class***").

3.    Notice. A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to Confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "***Notice***").

### C.    Final Approval of the Disclosure Statement and Confirmation of the Plan

1.    Requirements.  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.    Approval of the Plan and Confirmation Hearing. Before entering an order confirming the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.    Effect of Confirmation. Confirmation serves to make the Plan binding on the Debtors and all Creditors, Holders of Equity Interests, and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

4.    Only Impaired Classes Vote. Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or equity interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or equity interests in an impaired class do not receive or retain any property under a plan on account of their claims or equity interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 1a, 1b, 1c, 2a, 2b, and 2c are Unimpaired and therefore deemed to accept the Plan; Holders of Claims in Classes 3a, 3b, 3c, 4a, 4b, 4c, 5a, 5b, 5c are Impaired and are entitled to vote on the Plan; and Holders of Claims and Interests in Classes 6, 7a, and 7b are deemed to reject the Plan and are not entitled to vote on the Plan.

**Accordingly, a Ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Classes 3a, 3b, 3c, 4a, 4b, 4c, 5a, 5b and 5c.**

### D.    Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. To ensure your vote is counted, please vote and return your Ballot(s) in accordance with the instructions provided on the ballot.  Please note that only certain holders may vote through the e-ballot platform on the Solicitation Agent's website.   FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  For more information, please refer to the approved voting procedures in the order approving this Disclosure Statement (the "Disclosure Statement Order").

To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be received no later than 4:00 p.m. (Eastern Time) on March 3, 2023 (the "***Voting Deadline***").

If you received a Ballot from the Debtors, please send such completed Ballot directly to the Solicitation Agent so it is <u>actually received</u> on or before the Voting Deadline.  All Ballots sent to the Solicitation Agent should be sent by U.S. mail, e-mail, overnight courier or hand delivery to the following address:

Times Square JV LLC, et al.
Ballot Processing c/o Stretto
410 Exchange Suite 100
Irvine, CA 92602

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

(i)      any Ballot received after the Voting Deadline (unless extended by the Debtors);

(ii)     any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(iii)    any Ballot cast by a Person or Entity that does not hold a Claim or Equity Interest in a Class that is entitled to vote to accept or reject the Plan;

(iv)     any Ballot cast for a Claim scheduled as contingent, unliquidated or disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Order);

(v)      any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vi)     any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(vii)    any form of Ballot other than the official form sent by Stretto, Inc. (the "***Claims Agent***" or the "***Voting Agent***"), or a copy thereof;

(viii)   any Ballot received that the Voting Agent cannot match to an existing record;

(ix)     any Ballot that does not contain a signature;

(x)      any Ballot that is submitted by facsimile or email; or

(xi)     any Ballot sent to the Debtors' professionals.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must vote to accept the Plan.

You are urged to complete, date, sign and promptly mail your Ballot if you are a Holder of a Claim entitled to vote on the Plan. Please be sure to complete the Ballot properly and legibly and identify the exact amount of your Claim and the Creditor's name. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot or you lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or procedures for voting on the Plan, please contact the Voting Agent at <u>teamtimessquarejv@stretto.com</u> with a reference to "In re: Times Square JV LLC - Solicitation Inquiry" in the subject line, or (c) writing to the Claims,

Noticing, and Solicitation Agent at Times Square JV Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.  The Voting Agent is not authorized to and will not provide legal advice.

### E.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for March 10, 2023 at 9:30 a.m. (Eastern Time) in the United States Bankruptcy Court for the Southern District of New York (the "***Confirmation Hearing***"). The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be filed and served on or before March 3, 2022 at 4:00 (Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open court or otherwise, without further notice to parties in interest.

**The Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

## II.    GENERAL INFORMATION REGARDING THE DEBTORS[4]

### A.    The Debtors' Business

#### 1.    Description of the Business

Debtor TSJV owns a building (the "***Premises***") located at 1605 Broadway, New York, NY 10019, in central Times Square (between West 48th and 49th Streets). Debtor TJV leases the Premises to Debtor CPTS pursuant to an Agreement of Lease dated as of January 1, 2017, as amended (the "***Operating Lease***").  The Premises is a total of 840,000 square feet and consists, among other things, of certain hotel space on the 15th through 46th floors, currently branded as the Crowne Plaza Times Square Manhattan Hotel (the "***Hotel***"); 196,300 square feet of commercial office space (the "***Office Space***"), portions of which are currently leased to three third-party tenants; 17,800 square feet of ground floor retail space (the "***Retail Space***"); certain billboard spaces (the "***Signage Component***"); and a parking garage (the "***Parking Garage***").

Debtor 1601 Broadway Owner and Debtor 1601 Broadway Holding directly or indirectly own or lease certain real property underlying the Premises.

The Debtors have struggled for years, even before the global COVID-19 pandemic (the "***Pandemic***"), which dramatically exacerbated those struggles. As described in greater detail below, in connection with the Pandemic, in an effort to attempt to curtail losses, the Hotel closed on March 2020 and just recently resumed operations on November 1, 2022.  While some tenants remain in the Office Space and the Retail Space, the Pandemic led to a significant number of tenants defaulting on their obligation to pay rent or otherwise vacating the premises.

---

[4] The information herein is solely for informational purposes and nothing herein shall be deemed an admission by the Debtors in any Cause of Action.

The ground underlying the Property is divided into three parcels, the Vornado Fee Parcel[5], the Walber Fee Parcel[6] and the Riese Fee Parcel[7], each of which is described below. A diagram of these parcels in relation to the Property is below.



a)      **Vornado Fee Parcel**

Debtor TSJV is the owner of the largest portion of real property that underlies the Premises (such fee interest, the "***Vornado Fee Parcel***") located at Block 1020, Lot 46. This fee interest comprises both the Premises itself and the largest amount of ground underneath the Premises. As described further below, Debtor TSJV finances its ownership of the Vornado Fee Parcel through that certain Amended and Restated Mortgage Loan Agreement, dated as of April 19, 2018, by and among Debtors TSJV and CPTS, as borrowers, and Deutsche Bank AG, New York Branch, Morgan Stanley Bank, N.A., and others as lender (collectively, the "***Original Lenders***"), as amended (the "***Mortgage Loan Agreement***" and the loan thereunder, the "***Mortgage Loan***")[8] and a mezzanine loan between non-Debtors CPTS Hotel Lessee Mezz 1 LLC ("***CPTS Mezz Borrower***") and CIF Times Square Mezz 1 LLC ("***Times Square Mezz Borrower***" and together with CPTS Mezz Borrower, the "***Mezz***

---

[5] The "Vornado Fee Parcel" derives its name from the fact that it was historically owned by affiliates of Vornado Realty Trust.

[6] The Walber Fee Parcel was historically owned by a third party, Walber Broadway LLC ("<u>Walber</u>").

[7] The Riese Fee Parcel was historically owned by The Sylvia Riese Family Limited Partnership and 1609-1611 Broadway, LLC (collectively, "<u>Riese</u>").

[8] The Mortgage Loan was purchased by 1605 Broadway LLC (the "***Mortgage Lender***"), an affiliate of Argent Ventures, LLC (together with its affiliates, "***Argent***") on December 23, 2020 which, at the time, had been in default for several months and continues to be in default as of the Petition Date.

*Borrowers*") and Deutsche Bank AG, New York Branch, as lender ("*Original Mezzanine Lender*") (as amended, the "*Mezzanine Loan*")[9].

### b) Walber Fee Parcel

Debtor TSJV leases the second largest parcel of real property underlying the Building (the "*Walber Fee Parcel*") which is owned by Debtor 1601 Broadway Owner, a subsidiary of Debtor TSJV. The Walber Fee Parcel is approximately 11,000 square feet, and is located at the Southeast corner of the block between West 48th and 49th Streets where the Property is located.

Prior to the Petition Date, Walber had a longstanding ground lease (the "*Walber Ground Lease*") with Debtor TSJV as lessee for the Walber Fee Parcel, which also contained a right of first refusal in favor of Debtor TSJV to purchase the Walber Fee Parcel if Walber decided to sell the Walber Fee Parcel. In 2021, Walber sold its interest in the Walber Fee Parcel to SL Green Realty Corporation ("*SL Green*"), rejecting Debtor TSJV's attempt to exercise its right of first refusal. Debtor TSJV successfully sued Walber in New York State court to enforce its right of first refusal. See *Times Square JV LLC v. Walber Broadway LLC*, Index No. 0655450/2021 (N.Y. Sup. Mar. 30, 2022). Following entry of a judgment in favor of Debtor TSJV, Debtor TSJV, financed by an approximately $121 million advance from the Mortgage Lender under the Mortgage Loan, purchased the Walber Fee Parcel on May 3, 2022. In connection with this acquisition, Debtor TSJV became the owner (itself and through its subsidiary, Debtor 1601 Broadway Owner) of both the ground and structure comprising the Hotel (except for the Riese Fee Parcel) and the longstanding ground lease (the "Walber Ground Lease") was assigned to Debtor 1601 Broadway Owner, as landlord, and remains in effect.

### c) Riese Fee Parcel

The third parcel of real property underlying the Premises is that certain fee interest (the "*Riese Fee Parcel*") owned by 1609 Broadway LLC ("*1609 Broadway*"), an affiliate of Argent. The Riese Fee Parcel is the smallest parcel, constituting a 2,185 square foot property which has been improved by a two story building that sits adjacent to the 46-floor Hotel.

Prior to the Petition Date, the Debtors were also involved in extensive litigation with the prior owner of the Riese Fee Parcel. As a result of the Debtors' distress, Debtor TSJV had been unable to make payments under two ground leases with respect to the Riese Fee Parcel (the "*Riese Ground Leases*"). Prior to the Petition Date, Riese filed a lawsuit against Debtor TSJV seeking payment of the amount owed pursuant to the Riese Ground Leases at that time. In that lawsuit, the New York Supreme Court determined that Riese's sole remedy with respect to Debtor TSJV for non-payment under the Riese Ground Leases was to terminate the Riese Ground Leases.[10] This created significant uncertainty regarding Debtor TSJV's continued possession and operation of the part of the Premises under the Riese Fee Parcel and subject to the Riese Ground Leases. On December 28, 2022, 1609 Broadway successfully acquired the Riese Fee Parcel. As part of this purchase, the Debtors were released of all claims and obligations owed to Riese and the lawsuit will have been resolved. As a result of this transaction, significant uncertainty and litigation with respect to the Riese Fee Parcel and the Premises in general have been removed.

---

[9] The Mezzanine Loan was purchased by TSJV Mezz Acquisition LLC (the "*Mezzanine Lender*"), another affiliate of Argent, in March 2021, and, at the time, the Mezzanine Loan had also been in default concurrently with the Mortgage Loan and remains in default as of the Petition Date.

[10] *1609-11 Broadway LLC v. Times Square JV LLC*, 656058/2021, (N.Y. Sup. Apr. 29, 2022).

### 2.    Operating Lease

Debtor TSJV leases the Hotel and certain billboard spaces at the Property (the "**Signage Component**") to Debtor CPTS pursuant to the Operating Lease. Under the Operating Lease, CPTS has the right to use, occupy and operate the Hotel and Signage Component of the Property, including the right and authority to enter into subleases, license agreements and service agreements with third parties with respect to the same. The term of the Operating Lease expires on June 30, 2023, unless terminated by Debtor TSJV in accordance with the terms of the Operating Lease. Debtor CPTS does not have any ownership interest in any portion of the Premises; its primary asset is its leasehold interest under the Operating Lease. Portions of the Debtors' Signage Component have remained vacant for months and other continue to display advertisements for parties that are not paying monthly rent and, on the few occasions where portions of the Signage Component have been leased, the terms are generally below market.

### 3.    Retail and Office Space

The Premises currently has three office space tenants, Association for Computing Machinery ("**ACM**"), American Management Association ("**AMA**"), and Open Jar Studios ("**Open Jar**" and together with ACM and AMA, the "**Office Tenants**"). The monthly rent for the Office Tenants totals approximately $502,609. The AMA lease expires in 2027, with the other two leases expiring in 2034. AMA, which leased four floors of the Office Space under the terms of its original lease, vacated three of those floors and was in default with respect to payment of rent as a result of the Pandemic. AMA reached an agreement with Debtor TSJV to pay approximately $26,000 in additional rent each month through March 2027 in satisfaction of such arrears, and, subject to the agreement on arrearages, is not currently in default. As of the Petition Date, based in part on the ongoing impacts of the Pandemic on commercial space, there is 87,927 square feet of vacant Office Space at the Premises, representing approximately 45% of the total Office Space.

Additionally, the Premises host four retail tenants (the "**Retail Tenants**"), including Krispy Kreme, BHT 161 Broadway, 1601 Enterprises, and Crowne Garage LLC. The monthly rent for the Retail Tenants totals approximately $634,984, and the earliest lease expires at the end of 2022, with the next earliest expiring in 2030.

Two of the Retail Tenants have been in default under their respective leases. 1601 Enterprises has never made a rental payment since entering into its restaurant lease in April 2019, with a total amount of approximately $2,116,841.69 owed as of the Petition Date. Debtor TSJV sent a notice of default to 1601 Enterprises in August 2021; however, 1601 Enterprises failed to cure such default and, as a result, Debtor TSJV sent it a notice of intention to terminate the lease in August 2022, with such termination effective as of September 1, 2022.[11] BHT 1601 Broadway is also in default with respect to payment of certain rent that was due between May 2021 and October 2021, and January 2022 and February 2022, with a total amount of approximately $462,679.34 owed as of the Petition Date.

### 4.    Clear Channel Billboard Lease

CPTS leases a portion of the Signage Component at the Property (the "**Billboards**") to Clear Channel Spectacolor, LLC ("**Clear Channel**"). The lease commenced on January 1, 1996, and will

---

[11] As of the Petition Date, the Debtors have not taken further action with respect to the lease with 1601 Enterprises.

expire at the latest on June 29, 2032, assuming Clear Channel exercises all available extensions of the lease.

TSJV subleases a portion of the Billboards from Clear Channel, which TSJV then licenses to Krispy Kreme in connection with TSJV's retail lease with Krispy Kreme.

### 5.    Operation and Management of the Hotel

The day-to-day operations of the Premises, including the Hotel, are managed by Highgate Hotels, L.P. ("***Highgate***") pursuant to a management agreement with Debtor CPTS, which the Debtors and Highgate entered into an amendment and modification on November 1, 2022 (the original agreement, dated June 20, 2012, as amended on April 24, 2017, November 19, 2021, and November 1, 2022, the "***Management Agreement***").[12]  The current Management Agreement is a month-to-month agreement, which may be terminated by either party pursuant to its terms.  Under the Management Agreement, Highgate is responsible for, among other things, (i) the collection of gross receipts, charges, rents and other amounts due from guests, tenants, lessees, concessionaires and other debtors of the Premises, (ii) the hiring, firing, promotion, supervision, direction, training, and compensation[13] of all Hotel employees and personnel,[14] including the responsibility for negotiating with any labor unions representing any Hotel employees or personnel, and (iii) acting as leasing agent for the Office Space, Retail Space, Parking Garage, and Signage Component. Successful negotiations with respect to the modified Management Agreement have allowed Highgate to remain in place to manage the Premises and employees during the Pandemic and through the reopening of the Hotel, and continue to date.

### 6.    Crowne Plaza Franchise Agreement

The Hotel is currently operating as a "Crowne Plaza" hotel, a brand under the InterContinental Hotels Group portfolio ("***IHG***"), pursuant to the Crowne Plaza License Agreement (the "***License Agreement***") between Debtor CPTS and Holiday Hospitality Franchising LLC ("***Holiday***") dated July 1, 2012.  Debtor TSJV is not a party to the License Agreement.  As discussed below, the branding of the Hotel under the "Crowne Plaza" flag pursuant to the License Agreement, has constrained the success of the Hotel and prevented the Debtors from generating the revenue required to meet the Hotel's obligations. The License Agreement has an initial expiration date in March 2027 and Holiday (but not Debtor CPTS) has an option to renew for a renewal term that would expire in November 2036.

---

[12] Prior to November 2021, Vornado (as defined below) was responsible for managing the non-Hotel portions of the Premises pursuant to a prior management agreement (the "Former Management Agreement").

[13] Although Highgate is responsible for hiring decisions pursuant to the Management Agreement, Debtor CPTS provides Highgate with the funds to pay or otherwise satisfy such salaries and other costs and financial liabilities of Hotel personnel (the "Hotel Personnel").

[14] The majority of employees are party to that certain collective bargaining agreement dated as of July 1, 2012 (the "Collective Bargaining Agreement") by and between Hotel Association of New York City, Inc. and the New York Hotel and Motel Trades Counsel, AFL-CIO (the "Union").  Both before the Pandemic and through the closure and reopening of the Hotel, the Union has represented certain employees with respect to labor and employment matters.

14

### III.    THE DEBTOR'S CORPORATE STRUCTURE

The Debtors are organized as member-managed limited liability companies under Delaware law. Non-Debtor Times Square Mezz Borrower is the sole legal and beneficial owner of 100% of the issued and outstanding limited liability company membership interests in Debtor TSJV, which itself is the sole legal and beneficial owner of 100% of the issued and outstanding limited liability company membership interests in Debtor 1601 Broadway Holdings, which itself is the sole legal and beneficial owner of 100% of the issued and outstanding limited liability company membership interests in Debtor 1601 Broadway Owner. Vornado Realty, L.P. and Vornado Realty Trust (together, "*Vornado*") which own, manage and develop office real estate principally in New York City, including the Hotel, and are the ultimate indirect majority parent entities of all the Debtors and non-Debtor Times Square Mezz Borrower. Richard J. Shinder is the President, Treasurer and Director of Debtor TSJV.

Non-Debtor CPTS Mezz Borrower is the sole legal and beneficial owner of 100% of the issued and outstanding limited liability company membership interests in Debtor CPTS and, as noted above, Vornado is the ultimate indirect majority parent of Non-Debtor CPTS Mezz Borrower. Richard J. Shinder is the President, Treasurer and Director of Debtor CPTS.

### A.    The Debtors' Capital Structure

### 1.    Secured Debt

Debtor TSJV financed its ownership of the Vornado Fee Parcel and its leasehold interests in the Walber Fee Parcel and the Riese Fee Parcel pursuant to the Mortgage Loan. The Mortgage Loan Agreement had an original principal amount of $250 million. The obligations under the Mortgage Loan Agreement were originally secured by a first-priority mortgage lien on the Vornado Fee Parcel and Debtor TSJV's leasehold interests in the Walber Fee Parcel and Riese Fee Parcel.[15]

The Mortgage Loan Agreement originally went into default on April 24, 2020 as the applicable Debtors were unable to make scheduled principal and interest payments. The parties entered into an amendment to the Mortgage Loan Agreement, which, among other things, extended the maturity of the Mortgage Loan to July 9, 2020 and, pursuant to which, Debtors TSJV and CPTS repaid $55 million of principal owed on the Mortgage Loan to the Original Lenders financed by an

---

[15] As a result of the Hotel's subpar financial performance, in April 2018, in an effort to manage the Hotel's debts, Debtor TSJV and Debtor CPTS refinanced the Premises to consolidate and replace its previous debt with the current debt structure pursuant to the Mortgage Loan.

additional draw on the Mezzanine Loan.[16]  After the amendment and paydown, the principal balance then outstanding on the Mortgage Loan was $195 million plus accrued interest of $1,178,818.33.[17]

On June 9, 2020, the Original Lenders delivered a notice of default under the Mortgage Loan to Debtors TSJV and CPTS as a result of their inability to pay certain amounts due under the Mortgage Loan.  Debtor TSJV and Debtor CPTS were also unable to repay the principal balance of the Mortgage Loan upon maturity on July 9, 2020, triggering a maturity date event of default.

Eight months after the default on the Mortgage Loan, on December 23, 2020, the Mortgage Lender purchased it, at which time the principal balance due under the Mortgage Loan was $195 million in addition to accrued interest of approximately $7.6 million.  The obligations under the Mortgage Loan Agreement are secured by a first-priority mortgage lien on the Vornado Fee Parcel, a first-priority leasehold lien on both the Walber Fee Parcel and Riese Fee Parcel, and separately, as described further below, became secured by a first-priority mortgage lien on the Walber Fee Parcel.

On April 8, 2022, despite the Mortgage Loan being in default, the Mortgage Lender advanced an additional $30 million under the Mortgage Loan to enable Debtor TSJV to unite the two largest fee parcels by paying a deposit to purchase the Walber Fee Parcel.  On May 3, 2022, the Mortgage Lender advanced an additional $91,333,753.37 under the Mortgage Loan to Debtor TSJV in order to complete the purchase of the Walber Fee Parcel.  The Mortgage Loan Agreement was amended to reflect these additional advances and also to add 1601 Broadway Owner, the direct owner of the Walber Fee Parcel, as a separate borrower solely for the additional debt.  The $121,333,753.37 principal advanced on or after April 8, 2022 and any applicable interest or fees on that amount are secured by a first-priority mortgage lien on 1601 Broadway Owner's ownership of the fee interest in the Walber Fee Parcel.

Additionally, in 2022, the Mortgage Lender made a series of protective advances based on the Debtors' inability to meet the monthly operating expenses of the Premises.  Specifically, the Mortgage Lender funded a total of $4,748,130.16, as follows: $2,817,036.45 on May 27, 2022; $1,137,787.71 on June 30, 2022; $308,740.00 on October 28, 2022; and $484,566.00 on October 31,

---

[16]  The original principal amount of the Mezzanine Loan was $80 million.  On April 23, 2018, Original Mezzanine Lender sold the entire Mezzanine Loan to a group of affiliated lenders (collectively, "Apollo").  The obligations under the Mezzanine Loan Agreement are secured by first priority, continuing security interest in and lien on the equity interests, and certain voting rights, claims, powers, privileges, benefits, options and rights that the Mezz Borrowers hold in Debtor TSJV and Debtor CPTS, which security interests are reflected in that certain Pledge and Security Agreement dated April 19, 2018 (the "Mezzanine Security Agreement").  Like the Mortgage Loan, the Mezzanine Loan originally went into default on April 24, 2020, as the borrowers thereunder did not make scheduled principal and interest payments.  The parties entered into an amendment to the Mezzanine Loan Agreement, which, among other things, extended the maturity of the Mezzanine Loan to July 9, 2020.  The Mezz Borrowers were unable to repay the principal balance of the Mezzanine Loan upon maturity on July 9, 2020, triggering a further automatic event of default.  On March 18, 2021, despite the defaults under the Mezzanine Loan, an affiliate of Argent, the Mezzanine Lender, purchased the Mezzanine Loan from Apollo and assumed the rights and obligations of Apollo as lender thereunder.  As a result of the defaults under the Mezzanine Loan Agreement, on September 1, 2021, the Mezzanine Lender exercised its rights pursuant to the Mezzanine Security Agreement to exercise the voting rights the Mezz Borrowers held with respect to Debtors TSJV and CPTS.

[17]  As noted earlier and again below, these actions involved the Original Lenders, pre-dating the involvement of current lenders affiliated with Argent.

16

2022.   These protective advances provided crucial funding for the Debtors that allowed them to preserve the value of the Premises and eventually resume Hotel operations.[18]

Since on or about July 2020, Debtors TSJV and CPTS have been unable to make payments under the Mortgage Loan as they became due. As of the Petition Date, approximately $$418,726,016 in total of principal, accrued interest and fees is outstanding under the Mortgage Loan Agreement.

### 2.    Mechanics' Liens

As of the Petition Date, there are certain mechanics' liens outstanding with respect to the Hotel totaling $746,283.50.

### 3.    Unsecured Debt

As of the Petition Date, the Debtors' consolidated unsecured debt obligations totaled approximately $4,237,094.46.

### B.    Summary of Events Leading to the Debtors' Chapter 11 Filing

### 1.    Pre-Pandemic Distress

As noted, the Debtors have been facing significant distress and financial hardship for several years, even prior to the Pandemic, due to certain unfavorable contracts, primarily the branding of the Hotel under the "Crowne Plaza" flag pursuant to the License Agreement, which has constrained the success of the Hotel and prevented the Debtors from generating the revenue required to meet the Hotel's obligations.   The License Agreement has an initial expiration date in March 2027, with Holiday having an option to renew for a term that would expire in November 2036, subject to certain terms and conditions.

Aside from the Hotel's burdensome affiliation with the Crowne Plaza brand, the Hotel's other revenue streams were suffering as well.   For example, the operating costs associated with servicing meeting spaces and providing food and beverage exceeded the revenues from such activities leading to a drain on cash to pay expenses.

Finally, the complex ownership arrangements of the land underlying the Premises (namely the Walber Fee Parcel and the Riese Fee Parcel) also created uncertainty and financial strain on the Debtors.

### 2.    Distress and the Effects of the Global Pandemic

Compounding the Debtors' difficulty in operating the Hotel as a viable economic enterprise, the onset of the Pandemic created insurmountable challenges to the Debtors' businesses.   The implications of the Pandemic extended not only to Hotel bookings, which evaporated, but also to the leasing of Retail and Office Space at the Premises.

---

[18] It is my understanding that the Mortgage Lender has never exercised its event of default authority under the Mortgage Loan to sweep monies from the Debtors' accounts to pay itself.

The U.S. hospitality industry was among the hardest hit by the Pandemic and its devastating effects on tourism, social gatherings, and in-person business meetings.  Various travel restrictions and local ordinances that limited many forms of in-person events were particularly detrimental to the Hotel, given its location in the center of New York City's tourism hub and reliance on a combination of tourism and business travelers for its revenue.

The persistent nature of the Pandemic and Pandemic-related upheaval resulted in the Hotel remaining closed significantly longer than expected.  The Hotel only recently reopened on November 1, 2022.[19]  The prolonged nature of the Pandemic also negatively impacted the applicable Debtors' ability to lease the Office Space and Retail Space at the Premises.

As a result of the Pandemic, several companies that had been renting Office Space vacated the Premises early and in violation of their leases.  This further reduced the applicable Debtors' revenue during 2020 and 2021.  In all, 87,927 out of 196,186 total rentable square feet of Office Space is currently vacant, representing approximately 45% of the total Office Space available.  As explained above, other tenants ceased paying rent during 2020 and 2021, reducing cash on hand for the Debtors to pay their obligations.

Additionally, pursuant to a New York City-wide arbitration award issued by the Office of the Independent Chairperson dated September 11, 2020 (the "*Award*"), all union hotels in New York City were directed to pay severance to union associates laid off as a result of the Pandemic.  The Hotel's total severance liability under the Award was $7,450,452.00, which included severance to employees ($6,773,138.00), benefit fund contributions on severance ($1,693,285.00), and payroll taxes ($677,314.00). The Award also required the Hotel to pay a series of monthly payments, totaling $3,890,862.50, to the Union health fund, which was used to provide laid off employees with healthcare coverage during the period the Hotel was closed.  Vornado and/or the Original Lenders paid all or the majority of the amounts due under the Award.

Furthermore, pursuant to a local law enacted by the New York City Council on or about September 20, 2021 (the "*Local Law*"), the Hotel was required to pay an additional $500 per week in severance to associates (up to $15,000 per associate).  The Hotel's total liability under the Local Law was $5,247,000.00, of which Argent, Vornado (defined below), and Highgate agreed to each pay one third of the total pursuant to a separate agreement.

All of these factors combined to severely deteriorate the Debtors' financial health and stability.  The combination of burdensome branding and licensing arrangements, reduced bookings with respect to the Hotel, the inevitable shut down of the Hotel, reduced Office Space tenancy, reduced rental payments from tenants leasing the Retail Space, and severance requirements severely decreased cash on hand for the applicable Debtors to pay debt service and the other costs associated with the Hotel and Premises generally.  In addition to the pre-Pandemic challenges, during the Hotel's closure, described above, the applicable Debtors defaulted on their rent obligations, including rent to

---

[19] During the Hotel's closure, limited employees remained solely to ensure that the integrity of the space remained intact.  During this time, the Hotel ceased all non-essential services in an attempt to conserve resources, as, without revenue, it faced severe difficulty paying its debts as they came due.  As noted, the Debtors have not made payments on the Mortgage Loan in a number of years and, indeed, required additional advances from the Mortgage Lender to date.

ground lease both the Riese Fee Parcel and Walber Fee Parcel, and continued to be in default on debt service under both the Mortgage Loan and the Mezzanine Loan.

### 3.      Riese Litigation

As described above, prior to the Petition Date, Riese filed a lawsuit against Debtor TSJV seeking payment of the amount owed pursuant to the Riese Ground Leases at that time.  In that lawsuit, the New York Supreme Court determined that Riese's sole remedy with respect to Debtor TSJV for non-payment under the Riese Ground Leases was to terminate the Riese Ground Leases.[20] As part of 1609 Broadway's purchase of the Riese Fee Parcel on December 28, 2022, the Debtors were released of all claims and obligations owed to Riese and the lawsuit will have been resolved.

### 4.      Walber Litigation

As described above, for many months, the Debtors were burdened with a significant litigation against SL Green involving the Debtors' ability to purchase the Walber Fee Parcel through exercising a right of first refusal contained in the Walber Ground Lease.  Although the Debtors ultimately won this litigation, it was expensive, time consuming and made it difficult, if not impossible, to reopen the Hotel.  As described above following the Debtors' success in the litigation with SL Green, the Walber Fee Parcel is now owned by Debtor 1601 Broadway Owner.

### 5.      The Restructuring Support Agreement and Plan

In weighing their options and ultimately determining to pursue a chapter 11 filing, the Debtors engaged with certain entities with interests in the Premises to formulate a consensus regarding the terms of the Debtors' restructuring. The Debtors entered into a restructuring support agreement (the "***RSA***") with Vornado Capital Partners, L.P., Vornado Capital Partners Parallel, L.P. and Argent (collectively, the "***RSA Parties***").  Importantly, the RSA provides a path to a restructuring, through the Plan, which outlines the pursuit of the sale of the Premises and related rights (via the Plan or under section 363 of the Bankruptcy Code) or an equitization of the Mortgage Lender's secured debt.

After extensive discussions, on December 28, 2022, the RSA Parties executed the RSA regarding the material terms of a chapter 11 filing that would conclude in a sale transaction or restructuring. The RSA and the accompanying Plan are attached hereto as **Exhibit 2**.

The RSA Parties have agreed to support the restructuring transactions set forth in the Chapter 11 Plan, which was filed contemporaneously herewith.  Among other things, the Mortgage Lender agreed to permit the Debtors to use cash collateral on a consensual basis and to provide post-petition financing to enable the Debtors to implement their restructuring process through confirmation of the Chapter 11 Plan, including to commence a marketing process for the sale of all or substantially all of the Debtors' assets through the Chapter 11 Plan or separately under section 363 of the Bankruptcy Code.

The RSA provides that all parties thereto will use commercially reasonable efforts to take such steps as are necessary or appropriate to implement or support the Plan, and the related restructuring transactions, as applicable, and includes a variety of other commitments from the parties, including that 1605 Broadway LLC (in such capacity, the "***DIP Lender***") shall provide DIP financing in the

---

[20]      *1609-11 Broadway LLC v. Times Square JV LLC,* 656058/2021, (N.Y. Sup. Apr. 29, 2022).

amount of up to $10,000,000, subject to the Bankruptcy Court's entry of an order approving such DIP financing (the "***DIP Order***").

The RSA also requires the Debtors to file certain documents and satisfy certain objectives ("***Milestones***") within a specified period of time. These Milestones include, among others, the Debtors' commitment to (i) file a disclosure statement and the Chapter 11 Plan, in form and substance reasonably acceptable to the Mezzanine Lender, the Mortgage Lender and the DIP Lender, within one (1) business day after the Petition Date, (ii) file a motion seeking approval of bidding procedures,[21] in form and substance reasonably acceptable to the Mezzanine Lender, the Mortgage Lender and the DIP Lender, no later than one (1) days after the Petition Date, (iii) obtain entry of the DIP Order on an interim basis, no later than three (3) business days after the Petition Date, and on a final basis, no later than thirty-five (35) business days after the Petition Date, (iv) obtain entry of the Bankruptcy Court's order approving the bidding procedures within twenty-five (25) business days after the Petition Date, (v) obtain approval of a disclosure statement within thirty-five (35) days of the Petition Date, (vi) select a stalking horse bidder, if any, for a sale of the Premises and related assets no later than twenty-eight (28) days after the Petition Date, (vii) commit to a bid deadline no later than thirty-five (35) days after the Petition Date, (viii) conduct an auction, if necessary, no later than two (2) business days after the bid deadline, (ix) schedule a hearing to obtain entry of an order approving the sale and entering an order approving the sale of the Debtors' assets to the successful bidder, if applicable, within seventy-five (75) business days from the Petition Date, (x) obtain confirmation of a chapter 11 plan within seventy-five (75) days of the Petition Date, and (xi) ensure occurrence of the effective date of the chapter 11 plan within ninety (90) days of the Petition Date.

## IV.    THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On December 28, 2022, TSJV, CPTS, 1601 Broadway Owner and 1601 Broadway Holdings filed voluntary petitions for relief under chapter 11 of Bankruptcy Code in the Bankruptcy Court. No trustee or examiner has been appointed in the Chapter 11 Cases. Since the Petition Date, the Debtors have continued to manage their affairs and property as debtors and debtors-in-possession.

### B.    "First Day" Motions

On the Petition Date, the Debtors filed various motions designed to ease their transition into chapter 11 and to minimize the effects of the commencement of the Chapter 11 Cases.  These include motions seeking (i) authorization for the Chapter 11 Cases to be jointly administered for procedural purposes only [Dkt. No. 2]; (ii) authorization for the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor [Dkt. No. 7]; (iii) authorization for the Debtors to retain claims agent as their claims and noticing agent [Dkt. No. 6]; (iv) to prohibit the Debtors' utility companies from altering, refusing or discontinuing service to, or discriminating against, the Debtors and approving the form of adequate assurance of postpetition payment to such utility companies [Dkt. No. 8]; (v) authorization the payments of certain taxes [Dkt. No. 9], (vi) authorize the continued use of cash management system [Dkt. No. 10], (vii) continue customer

---

[21] A separate declaration explaining the appropriateness of the proposed bidding procedures is attached as Exhibit A to the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (II) Scheduling Certain Dates Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment, (V) Approving the Sale and (VI) Granting Related Relief* filed contemporaneously herewith.

programs [Dkt. No. 11], (viii) authorize the payment of prepetition wages [Dkt. No. 12] (ix) authorization for the Debtors to obtain postpetition financing and use cash collateral, and granting adequate protection to the Secured Lenders [Dkt. 13].

A hearing to consider granting interim orders with respect to the foregoing motions is scheduled for December 30, 2022 and a hearing to consider granting final orders with respect to the foregoing motions is scheduled for January 20, 2023.

### C.    Retention of Debtors' Professionals

The Debtors intend to file applications to retain the following professionals in the Chapter 11 Cases: (i) Seward & Kissel LLP as bankruptcy counsel; (ii) Emerald Capital Advisors as financial advisor; (iii) Eastdil Secured, L.L.C. as broker; (iv) Meister Seelig & Fein LLC as landlord-tenant counsel; and (v) Stretto, Inc. as claims and noticing agent.

### D.    Significant Events During the Chapter 11 Cases

#### 1.    Marketing Period and Potential Sale of Property and Related Assets

The Debtors have retained Eastdil Secured, L.L.C. (the "***Broker***") to run a public marketing process for the Property and related assets (collectively, the "***Assets***").  The Broker was retained on December 2, 2022, and has commenced a marketing period that will run through the Bid Deadline. The Debtors encourage any party with interest in purchasing the Assets to contact the Broker.

#### 2.    Debtor-in-Possession Financing and Use of Cash Collateral

When the Debtors filed the Chapter 11 Cases, all of their cash was the cash collateral of the 1605 Broadway LLC (in such capacity, the "***Prepetition Secured Party***"). Even if the Debtors had unrestricted access to their cash, they still would not have had sufficient liquidity to maintain their operations and fund their expenses during the Chapter 11 Cases.

On the Petition Date, the Debtors filed a motion ("***DIP Financing Motion***") seeking Bankruptcy Court approval of their proposed funding for the Chapter 11 Cases from two sources: (a) an unsecured, superpriority credit facility of up to $10,000,000 (the "***DIP Facility***") provided to the Debtors by the DIP Lender, and (b) the Debtors' use of cash collateral, which is subject to a first-priority lien securing the Mortgage Loan. The Debtors seek Bankruptcy Court approval to draw up to $4,000,000 of the DIP Facility on an interim basis and to use the Secured Lenders' cash collateral to pay necessary expenses in relation to the Premeis.  The Debtors seek to draw up to the remaining $6,000,000 of the DIP Facility on a final basis with a hearing to consider the DIP Financing Motion on a final basis is scheduled for January 20, 2023.

The size of the DIP Facility is based on the Debtors' cash flow projections, which are reflected in the 13-week budget attached as an exhibit to the DIP Financing Motion (the "***Budget***"). The Budget reflects a reasonable and detailed estimate of, among other things, the Debtors' sources and uses of liquidity during the Chapter 11 Cases. The DIP Facility and the use of cash collateral provides the Debtors with the liquidity they need to pay their ordinary-course post-petition expenses and fund the costs and expenses of the Chapter 11 Cases.

The proposed order approving the DIP Financing Motion (the "***Interim Financing Order***") provides standard adequate protection liens and adequate protection claims to the Prepetition Secured Party, which the Prepetition Secured Party required as a condition to, among other things, the Debtors' use of cash collateral. The Interim Financing Order also includes releases and stipulations

regarding the validity and enforceability of the Prepetition Secured Party's claims and liens on the Debtors' collateral. Prior to agreeing to these stipulations, the Debtors undertook appropriate efforts to verify that the Prepetition Secured Party's liens were properly perfected. The Debtors, though counsel, reviewed the recorded mortgage documents on the Hotel and real property and ordered and reviewed current UCC-1 financing statements covering the Prepetition Secured Party's liens on the other collateral. The Debtors, through counsel, have undertaken other measures as well. Before agreeing to the releases provided for in the Interim Financing Order, the Debtors and their advisors also discussed and considered whether any potential meritorious causes of action against the Prepetition Secured Party exist.

At the final hearing on the DIP Financing Motion the Debtors will seek an order that the stipulations in the Interim Financing Order will become binding on all parties-in-interest in the Chapter 11 Cases unless they are successfully challenged pursuant to a challenge proceeding commenced (a) by any official committee of unsecured creditors appointed in the Chapter 11 Cases within sixty (60) days after entry of the Interim Financing Order or (y) any later date as has been agreed to, in writing, by the DIP Lender.

### E.    The Debtors' Employees and Collective Bargaining Agreements

The majority of employees are party to that certain collective bargaining agreement dated as of July 1, 2012 (the "*Collective Bargaining Agreement*") by and between Hotel Association of New York City, Inc. and the New York Hotel and Motel Trades Counsel, AFL-CIO (the "*Union*").  Both before the Pandemic and through the closure and reopening of the Hotel, the Union has represented certain employees with respect to labor and employment matters.

To ensure the staffing for the continued operations of the Hotel, under the RSA, in connection with confirmation of the Plan, the reorganized Debtors have agreed to assume the Collective Bargaining Agreement with respect to the Hotel employees and, in the case of a sale to a third party, the Debtors have agreed to require parties bidding on the Debtors' assets to similarly agree to assume the Collective Bargaining Agreement.

## V.    SUMMARY OF PLAN

**This section provides a summary of the structure and means for implementing the Plan and the classification and treatment of Claims and Equity Interests under the Plan. This section is qualified in its entirety by and is subject to the Plan, as well as the exhibits thereto and definitions therein. The Plan is attached to this Disclosure Statement as Exhibit A.**

**The statements in this Disclosure Statement include summaries of the provisions in the Plan and in documents referred to therein. The statements in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein. Reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.**

**The Plan and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan. Upon occurrence of the Effective Date, the Plan and all such documents will be binding upon all Holders of Claims against and Equity Interests in the Debtors and their Estates and all other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other**

operative document, on the other hand, the terms of the Plan or such other operative document will control.

A.      **Treatment of Claims**

*"Payout Event"* means the implementation of one or more Successful Bids, in accordance with the Bidding Procedures, by a Person that is not a Secured Lender or DIP Lender, for all of the Debtors' Assets in which the proceeds of any Successful Bid (or Successful Bids, as applicable) when combined with Cash proceeds received from the Debtors' operations provides the Debtors with Cash necessary to (i) satisfy all claims of the DIP Lender, (ii) satisfy all Mortgage Lender Secured Claims (unless the Secured Lender agrees to a lesser amount), (iii) satisfy the Allowed Administrative Expense Claims, (iv) satisfy any break-up fee or expense reimbursement payable under the Bidding Procedures Order, (v) fund the Administrative Expense and Priority Escrow Account, and (vi) fund the Liquidation Trust Funding Amount, each on or before the Effective Date.

1.      **Unclassified Claims**

a.      *Administrative Expense Claims*

Each Holder of an Allowed Administrative Expense Claim, other than DIP Claims, shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Expense Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is ten (10) Business Days after the date on which such Administrative Expense Claim becomes Allowed, (c) the date on which such Administrative Expense Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder, and (d) such other date as mutually may be agreed to by such Holder and the Debtors with the consent of the Secured Lenders and the DIP Lender. Notwithstanding the foregoing, *if a Payout Event does not occur*, Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents thereto.

b.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors with the consent of the Secured Lenders and the DIP Lender, acting reasonably and in good faith; *provided, however*, that the Debtors shall be authorized, at their option, with the consent of the Secured Lenders and the DIP Lender, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

c.      *DIP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for release of all Allowed DIP Claims, on the Effective Date, the DIP Claims shall:

*If a Payout Event occurs*, (i) be paid in Cash in full, or (ii) receive such other treatment as agreed by the Debtors and the applicable Holder of a DIP Claims; or

*If a Payout Event does not occur*, (i) convert all of the DIP Claims into Reorganized TSJV Equity Interests on a pro rata basis together with the Mortgage Lender Secured Claims or receive such other treatment as agreed to by the Debtors and the DIP Lender.

**2.    Classified Claims**

*a.    Class Identification*

This Plan is a joint plan but constitutes a separate Plan for each Debtor. The classifications for each Debtor are set forth below. Classes 1a, 2a, 3a, 4a, 5a, and 7a are comprised of Holders of Claims and against, and Interests in, TSJV. Classes 1b, 2b, 3b, 4b, 5b, and 7b are comprised of Holders of Claims against, and Interests in, CPTS.  Classes 1c, 2c, 3c, 4c, 5c, and 6 are comprised of Holders of Claims against, and Interests in the 1601 Broadway Entities.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1a, 1b, 1c | Other Priority Claims | Unimpaired | Presumed to Accept |
| Class 2a, 2b, 2c | Other Secured Claims | Unimpaired | Presumed to Accept |
| Class 3a, 3b, 3c | Mortgage Lender Secured Claims | Impaired | Entitled to Vote |
| Class 4a, 4b, 4c | Ongoing Trade Claims | Impaired | Entitled to Vote |
| Class 5a, 5b, 5c | Other Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims and Interests | Unimpaired/ Impaired | Presumed to Accept/ Deemed to Reject |
| Class 7a, 7b | Equity Interests | Impaired | Deemed to Reject |

*b.    Class 1a, 1b, 1c—Other Priority Claims.*

*Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against each Debtor or Reorganized Debtor are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes Allowed, (c) the date on which such Other Priority Claim otherwise is due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Debtor with the consent of the Secured Lenders and the DIP Lender.

*Impairment and Voting:* Allowed Other Priority Claims are Unimpaired. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims.

      *c.       Class 2a, 2b, 2c—Other Secured Claims*.

*Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall, at the option of the Reorganized Debtors, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated. The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

*Impairment and Voting*: Allowed Other Secured Claims are Unimpaired. Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

      *d.       Class 3a, 3b, 3c—Mortgage Lender Secured Claims*.

*Class 3a Treatment*: In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Mortgage Lender Secured Claim, each Holder of an Allowed Mortgage Lender Secured Claim against TSJV shall receive (1) *if a Payout Event occurs*, its (i) Pro Rata share of the Mortgage Lender Secured Cash Payment payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other less favorable treatment as agreed by the Debtors and the applicable Holder of a Mortgage Lender Secured Claim; or (2) *if a Payout Event does not occur*, its (i) Pro Rata Share, together with the holders of DIP Claims, of the Reorganized TSJV Equity Interests, or (ii) such other less favorable treatment as agreed by the Debtors and the applicable Holder of a Mortgage Lender Secured Claim.

*Class 3b Treatment*: Holders of Allowed Mortgage Lender Secured Claims against CPTS shall not receive any distribution on account of such Allowed Mortgage Lender Secured Claims against CPTS and all such Allowed Mortgage Lender Secured Claims against CPTS shall be cancelled and discharged.

*Class 3c Treatment*: In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Mortgage Lender Secured Claim, each Holder of an Allowed Mortgage Lender Secured Claim against the 1601 Broadway Entities shall receive (1) *if a Payout Event occurs*, its (i) Pro Rata share of the Mortgage Lender Secured Cash Payment payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other less favorable treatment as agreed by the Debtors and the applicable Holder of a Mortgage Lender Secured Claim; or (2) *if a Payout Event does not occur*, its (i) portion of the Exit Facility in an amount equal to the outstanding obligations of the 1601 Broadway Owner under the Walber Parcel Mortgage Loan, or (ii) such other less favorable treatment as agreed by the Debtors and the applicable Holder of a Mortgage Lender Secured Claim.

*Impairment and Voting*: Mortgage Lender Secured Claims are Impaired. Holders of such Mortgage Lender Secured Claims will be entitled to vote to accept or reject the Plan.

e.      *Class 4a, 4b, 4c—Ongoing Trade Claims*.

*Class 4a Treatment*: Except to the extent that a Holder of an Allowed Ongoing Trade Claim against TSJV agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Ongoing Trade Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Ongoing Trade Claim against TSJV shall receive, on account of such Allowed Claim,

(x)      *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 5a Claims) of Net Sale Proceeds at TSJV, or

(y)      *if a Payout Event does not occur*, fifty (50%) percent of its Pro Rata Share of the TSJV Ongoing Trade Claim Cash Pool, and the right to payment of the remaining fifty percent (50%) of its Pro Rata Share of the TSJV Ongoing Trade Claim Cash Pool from the Disbursing Agent no later than six (6) months after the Effective Date.

*Class 4b Treatment*: Except to the extent that a Holder of an Allowed Ongoing Trade Claim against CPTS agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Ongoing Trade Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Ongoing Trade Claim against CPTS shall receive, on account of such Allowed Claim,

(x)      *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 5b claims) of Net Sale Proceeds at CPTS; or

(y)      *if a Payout Event does not occur*, fifty (50%) percent of its Pro Rata Share of the CPTS Ongoing Trade Claim Cash Pool, and the right to payment of the remaining fifty percent (50%) of its Pro Rata Share of the CPTS Ongoing Trade Claim Cash Pool from Disbursing Agent no later than six (6) months after the Effective Date.

*Class 4c Treatment*: Except to the extent that a Holder of an Allowed Ongoing Trade Claim against the 1601 Broadway Entities agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Ongoing Trade Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Ongoing Trade Claim against the 1601 Broadway Entities shall receive, on account of such Allowed Claim,

(x)      *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 5c claims) of Net Sale Proceeds at the applicable 1601 Broadway Entity; or

(y)      *if a Payout Event does not occur*, fifty (50%) percent of its Pro Rata Share of the 1601 Broadway Ongoing Trade Claim Cash Pool, and the right to payment of the remaining fifty percent (50%) of its Pro Rata Share of the 1601 Broadway Ongoing Trade Claim Cash Pool from the Disbursing Agent no later than six (6) months after the Effective Date.

*Impairment and Voting*:  Ongoing Trade Claims are Impaired.  Holders of such Ongoing Trade Claims will be entitled to vote to accept or reject the Plan.

f.      *Class 5a, 5b, 5c—Other Unsecured Claims*.

*Class 5a Treatment*:  Except to the extent that a Holder of an Allowed Other Unsecured Claim against TSJV agrees to less favorable treatment, on the later of the Effective Date and the date that is

ten (10) Business Days after the date such Other Unsecured Claims becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Unsecured Claim against TSJV shall receive, on account of such Allowed Claim,

(x)     *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 4a Claims) of Net Sale Proceeds at TSJV, or

(y)     *If a Payout Event does not occur*, Holders of Other Unsecured Claims against TSJV shall not receive any distribution on account of such Other Unsecured Claim and all such Other Unsecured Claims shall be cancelled and discharged.

*Class 5b* Treatment: Except to the extent that a Holder of an Allowed Other Unsecured Claim against CPTS agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Unsecured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Unsecured Claim against CPTS shall receive, on account of such Allowed Claim,

(x)     *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 4b claims) of Net Sale Proceeds at CPTS; or

(y)     *If a Payout Event does not occur*, Holders of Other Unsecured Claims against CPTS shall not receive any distribution on account of such Other Unsecured Claim and all such Other Unsecured Claims shall be cancelled and discharged.

*Class 5c Treatment*: Except to the extent that a Holder of an Allowed Other Unsecured Claim against the 1601 Broadway Entities agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Unsecured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Unsecured Claim against the 1601 Broadway Entities shall receive, on account of such Allowed Claim,

(x)     *if a Payout Event occurs*, its Pro Rata Share (together with Holders of Class 4c claims) of Net Sale Proceeds at the applicable 1601 Broadway Entity; or

(y)     *If a Payout Event does not occur*, Holders of Other Unsecured Claims against the 1601 Broadway Entities shall not receive any distribution on account of such Other Unsecured Claim and all such Other Unsecured Claims shall be cancelled and discharged.

g.     *Class 6—Intercompany Claims and Interests*.

*Treatment*: On the Effective Date, all Intercompany Claims and all of the Intercompany Interests in the subsidiaries of TSJV and CPTS will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' or Reorganized Debtors' discretion.

*Impairment and Voting*: Intercompany Claims and Intercompany Interests are Unimpaired/Impaired. Holders of such Intercompany Claims and Intercompany Interests are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

h.     *Class 7a and 7b —Equity Interests*.

*Treatment*: All Equity Interests in TSJV and CPTS shall be cancelled, released, discharged and extinguished on the Effective Date.

*Impairment and Voting:* Equity Interests are Impaired. Holders of such Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited.

**B.**    **Means for Implementation of the Plan**

*1.    Means for Implementation if a Payout Event Occurs*

*If a Payout Event occurs*, the Successful Bid (or Successful Bidders, as applicable) shall transfer to the Debtors pursuant to the Bidding Procedures the Cash necessary to (i) satisfy all claims of the DIP Lender, (ii) satisfy all claims of the Secured Lenders; (iii) satisfy any break-up fee or expense reimbursement payable under the Bidding Procedures Order, (iv) fund the Administrative Expense and Priority Escrow Account, and (v) fund a wind-down budget of no more than $1,000,000, each on or before the Effective Date. Following the payment of distributions to the DIP Lender and the Secured Lenders on the Effective Date, the Net Sale Proceeds shall be available for distribution as provided under the Plan.

*If a Payout Event does not occur*, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall implement a series of transactions (the "**Restructuring Transactions**"), including (a) the exchange of 100% of the DIP Facility and no more than [•] of the Mortgage Loan for a pro rata share of 100% of the Reorganized TSJV Equity Interests, (b) cancellation of the Interests in TSJV and CPTS, and (c) entry into the Exit Facility Credit Agreement.

## VI.    ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    General

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) and Interests; (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### B.    Parties Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class entitle the Holders of such Claims or Equity Interests are

modified, other than by curing defaults and reinstating the Claims or Equity Interests. Classes that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.    Classes Impaired and Entitled to Vote under the Plan

Holders of Claims in Classes 3a, 3b, 3c, 4a, 4b, 4c, 5a, 5b, 5c are Impaired under the Plan and entitled to vote.

### D.    Voting Procedures and Requirements

#### 1.    Ballots

The Solicitation Procedures Order sets [[•]], 2023 as the record date for voting on the Plan (the "***Record Date***"). Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement. If you are a Holder of a Claim in Class 3a, 3b, 3c, 4a, 4b, 4c, 5a, 5b, or 5c and did not receive a Ballot, your Ballot is damaged or lost, or you have any questions concerning voting procedures, please contact the at teamtimessquarejv@stretto.com with a reference to "In re: Times Square JV LLC - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Times Square JV Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. The Voting Agent is not authorized to and will not provide legal advice.

#### 2.    Returning Ballots

After carefully reviewing the Plan, this Disclosure Statement, all related Exhibits, and the instructions and other documents accompanying your Ballot, please indicate your Acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Please complete and sign your Ballot and return it, with original signature, in the envelope provided, or by following the instructions on your Ballot submit your customized electronic Ballot via the E-Balloting Portal, which is accessible at https://cases.stretto.com/timessquarejv.

**To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be RECEIVED no later than the Voting Deadline**.

#### 3.    Voting

Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a)(7) and 3003(c)(2), any Creditors whose Claims (a) are Scheduled in the Debtors' Schedules as disputed, contingent or unliquidated and which are not the subject of a timely-filed Proof of Claim, or a Proof of Claim deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely filed under applicable law; or (b) are not Scheduled and are not the subject of a timely-filed Proof of Claim, or a Proof of Claim deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court, or otherwise deemed timely filed under applicable law, will be denied treatment as Creditors with respect to such Claims for purposes of (a) voting on the Plan, (b) receiving Distributions under the Plan and (c) receiving notices, other than by publication, regarding the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

a.  if an order has been entered by the Bankruptcy Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

b.  if no such order has been entered, then in the liquidated amount set forth in a timely-filed Proof of Claim that is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order); and

c.  if no such Proof of Claim has been timely filed, then in the liquidated, noncontingent and undisputed amount set forth in the Schedules.

For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

a.  if a Claim is partially liquidated and partially unliquidated, such Claim will be allowed for voting purposes only in the liquidated amount;

b.  if a Scheduled or filed Claim has been paid, such Claim will be disallowed for voting purposes; and

c.  the Holder of a timely-filed Proof of Claim that is filed in a wholly unliquidated, contingent, disputed and/or unknown amount, and is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order), is entitled to vote in the amount of $1.00.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving motions pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan is [[•]], 2023 at [[•]] (Eastern Time) (the "***Rule 3018(a) Motion Deadline***").

### E.    Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims vote to accept the plan, except under certain circumstances. *See* "Confirmation Without Necessary Acceptances; Cramdown" in Article F below. A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan. A plan is accepted by an impaired class of interests if holders of at least two-thirds in amount of interests of those that vote in such class vote to accept the plan. Only those holders of claims and equity interests who vote count in these tabulations. Holders of claims and equity interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or equity interest in such class. *See* "Best Interests Test" in Article VII below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination"

tests set forth in section 1129(b) of the Bankruptcy Code discussed below. *See* "Confirmation Without Necessary Acceptances; Cramdown" in Article F below.

### F.    Confirmation Without Necessary Acceptances; Cramdown

If any impaired class of claims or equity interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or equity interests.

Here, because Classes 7a, 7b are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied as no Claim or Equity Interest Holder junior to those in Classes 7a and 7b will receive any property under the Plan.

### 1.    No Unfair Discrimination

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or equity interests. The Debtors believe that under the Plan all Impaired Classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Equity Interests that are similarly situated, if any, and no Class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Equity Interests.

### 2.    Fair and Equitable Test

With respect to a dissenting class of claims or equity interests, the "fair and equitable" standard requires that a plan provide that either the claims or equity interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing. The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and equity interests, which may be summarized as follows:

<u>a.</u>    <u>Secured Claims.</u> Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

b.      Unsecured Claims. Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

c.      Equity Interests. Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock; or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule.

## VII.    BEST INTERESTS AND FEASIBILITY TESTS

### A.      Best Interests Test

Before the Plan may be confirmed, the Bankruptcy Court must find the Plan provides, with respect to each Impaired Class, that each Holder of a Claim or Interest in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit [[•]]**.

The Liquidation Analysis provided in **Exhibit [[•]]** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### B.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a debtor must demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *See* 11 U.S.C. § 1129(a)(11). This is often referred to as the "feasibility" requirement.

### 1.    Treatment of Debtors

The Plan contemplates either a sale to a third party or an equitization restricting.  In the event of an equitization restructuring, the Plan considers the possible provision of exit financing to support the capital needs of the Hotel going forward.  Moreover, the Hotel's expenses and other obligations will also be supported by operating revenue.

A hotel's projected revenues are typically the result of assumptions such as occupancy demand, average daily rate (or "ADR") and revenue per available room (or "RevPar"). Expectations for the Hotel are generally in line with industry-wide forecasts. Although the Debtors do not anticipate disclosing a business plan or forward-looking projections for the Business until after the Debtors' motion for an order approving their proposed solicitation procedures ("***Solicitation Procedures Motion***") is approved and a winning bidder is selected, high-level expectations for the Hotel are currently as follows:

The Hotel's operations resumed on November 1, 2022 and the Hotel began to generate net positive income by [[•]]. That net operating income would be available to help support the Hotel's operating, financing, and other expenses in the ordinary course of business.

The expectations disclosed above are based on numerous assumptions, including confirmation of the Plan in accordance with its terms, the occurrence of the Effective Date in the early 2023, realization of the operating strategy of the reorganized Debtors, no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles, no material adverse changes in general business and economic conditions, no material adverse changes in competition, that travel, gathering, and other restrictions implemented in response to COVID-19 will continue to ease, the absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters, many of which will be beyond the control of the reorganized Debtors and some or all of which may not materialize. Consequently, the estimates and assumptions set forth herein are inherently uncertain and are subject to material business, economic, public health, and other uncertainties. Therefore, the expectations disclosed herein are not necessarily indicative of future performance, which may be significantly less or more favorable than set forth herein. Readers are thus encouraged not to place undue reliance on the disclosed expectations.

The disclosed information regarding future Hotel performance should be read together with the information in Article IX of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from expectations.

### 2.    Certain Tax Treatment Under Plan

*Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligations or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and other amounts (such as accrued but unpaid interest or deemed interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for U.S.

federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

*Exemption from Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange (or deemed issuance, transfer or exchange) of the [Plan Securities]; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property) will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, transaction privilege tax, privilege taxes, or other similar taxes in the United States. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date shall be deemed to have been in furtherance of or in connection with the Plan.]

## VIII.   EFFECT OF CONFIRMATION

### A.      Binding Effect of Confirmation

Confirmation will bind the Debtors and all Holders of Claims and Equity Interests to the provisions of the Plan, regardless of whether the Claim or Equity Interest of any such Holder is Impaired under the Plan and any such Holder of a Claim or Equity Interest has accepted the Plan.

### B.      Good Faith

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## IX.   CERTAIN RISK FACTORS TO BE CONSIDERED

**The Plan and its implementation are subject to certain risks, including, but not limited to, the risk factors set forth below. Holders of Claims who are entitled to vote on the Plan should read and carefully consider the risk factors, as well as the other information in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan**.

### A.      Certain Bankruptcy Law Considerations

#### 1.      Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

### 2.    Judicial Discretion in Confirmation of Plan

Even if the Holders of Claims who are entitled to vote accept the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that Confirmation of the Plan will not be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of Distributions to dissenting Holders of Claims or Equity Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe the Plan meets these requirements, there can be no assurance the Bankruptcy Court will reach the same conclusion.

### 3.    Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to, or be deemed to, reject the Plan, these requirements must be satisfied with respect to such rejecting Classes. Pursuant to the Plan, the Non-Voting Impaired Classes – Classes [[•]] – are deemed to reject the Plan and, accordingly, are not entitled to vote.  The Debtors believes that the Plan satisfies these requirements with respect to such Classes.

### 4.    Distributions to Holders of Allowed Claims Under the Plan

On the Effective Date, each Holder of an Allowed Ongoing Trade Claim will, by operation of the Plan, receive its pro rata share of the Ongoing Trade Claims Cash Pools.  A substantial amount of time may elapse between the Effective Date and the receipt of distributions because of the time required to achieve final resolution of Disputed Claims. Moreover, although the Debtors have made a good faith estimate of projected recoveries to Holders of Ongoing Trade Claims under the Plan, such recoveries will be less than projected if, for example, the aggregate amount of General Unsecured Claims asserted against the Debtors which ultimately are Allowed exceeds the estimated amount of such Claims.

### 5.    Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 6.    Conditions Precedent to the Effective Date of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date of the Plan. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent will be satisfied (or waived). Accordingly, there can be no assurance that the Plan, even if confirmed by the Bankruptcy Court, will become effective.

7.        **DIP Financing**

As set forth above, to continue its business operations and fund the Chapter 11 Cases, the Debtors have negotiated and secured a commitment for debtor-in-possession financing from the DIP Lender and filed the DIP Motion to seek approval of the proposed DIP Loan. If the or if the Chapter 11 cases continue longer than expected or if the Debtors default under their obligations under the DIP Loan, the Debtors may exhaust or lose access to their financing before the transactions contemplated under the Plan can be effectuated. There is no assurance that the Debtors will be able to obtain additional financing from other third-party lenders. In either such case, the liquidity necessary to consummate the Plan may be materially impaired.

8.        **Restructuring Support Agreement**

The Debtors entered into the RSA with the RSA Parties on December 28, 2022 as described above. The RSA provides that all parties thereto will use commercially reasonable efforts to take such steps as are necessary or appropriate to implement or support the Plan and the related restructuring transactions. However, there are no assurances the RSA Parties will keep their various commitments under the RSA which may impair the successful confirmation and implantation of the Plan. The RSA includes a variety of Milestones, described in further detail above, and if the Debtors are unable to satisfy certain of those Milestones, the RSA Parties can terminate the RSA. If the RSA is terminated, the Debtors' ability to consummate the Plan may be materially impaired.

9.        **Conversion to a Chapter 7 Case**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

B.        **Factors Impacting the Value of the Debtors**

1.        **Claims Could Be More Than Projected**

There can be no assurance that the Allowed amount of Claims will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, unanticipated events and circumstances may affect the ultimate results. The actual amount of Allowed Claims may vary from the Debtors' feasibility analysis, and the variation may be material.

2.        **Inability to Meet Future Obligations**

The financial projections attached hereto as Exhibit [[•]] demonstrate that the reorganized Debtors have sufficient capital and means to consummate the Plan and meet its obligations on a go-forward basis. However, due to various unforeseen market factors and causes, there is a risk that the reorganized Debtor will not generate sufficient cash to meet its future obligations, including with respect to the payments on any Unimpaired Claims under the Plan.

3.        **General Economic Conditions**

Global market forces may cause the global economy to worsen in the coming years, as a result of factors such as generalized inflation, disruption to global supply chains, a foreign energy crisis,

and other factors impacting the local or global economy. These economic conditions may ultimately increase the Debtors' expenses, decrease demand for their services, or both, which may result in an inability to meet future obligations as described above.

### 4.    Ongoing Impact of Pandemic

The Pandemic has caused a significant decline in travel and demand for hotels and guestrooms, which is adversely impacting the Debtors' businesses. The Debtors expect to see guest demand and revenue increase but the extent to which the Pandemic will ultimately impact financial results will depend on future events, which are unknown and cannot be predicted, including COVID-19 infection rates, new information which may emerge regarding the COVID-19 (including, but not limited to, the development and transmission of any new strains of the virus), consumer preferences, and the re-imposition of governmental and business restrictions on travel, among others. Additional waves of the COVID-19 virus could lead to new travel restrictions and reductions in economic activity, resulting in further disruptions to the Debtors' operations and cash flow.

### 5.    Exposure to Litigation

As described above, certain of the Debtors are involved in ongoing litigation with IHG and certain of the Debtors were recently involved in litigation with Riese. These cases, any related appeals and/or any or other unforeseen litigation, could progress in a manner unfavorable to the Debtors.

### C.    Additional Factors

### 1.    Debtors Could Withdraw the Plan

The Plan may be revoked or withdrawn by the Debtors prior to the Bankruptcy Court's confirmation of the Plan.

### 2.    Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

5.        **Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with Consummation of the Plan. Holders of Claims voting on the Plan should read carefully the discussion of certain federal income tax consequences of the Plan set forth below.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended ("***IRC***"), U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims (a "***Holder***") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  Because the Debtors are disregarded entities for U.S. federal income tax purposes (and any income or loss resulting from the Plan will, therefore, be includable by the Debtors' beneficial owners and not by the Debtors themselves), this summary does not address the tax consequences of the Plan on the Debtors.  This summary also does not address the U.S. federal income tax consequences to Holders of DIP Claims or Mortgage Lender Secured Claims;[22] persons not entitled to vote on the Plan; Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, Holders that are, or hold Claims through, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; U.S. Holders that have a "functional currency" other than the U.S. dollar; and Holders that have acquired Claims in connection with the performance of services. This summary does not address state, local or non-U.S. taxes, the U.S. federal estate and gift taxes, the alternative minimum tax or the Medicare tax on net investment income. The following summary assumes that Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) whether the Holder is a citizen or resident of the U.S. for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iii) the manner in which the Holder acquired the Claim; (iv) the length of time that the Claim has been held; (v) whether the Claim was acquired at a discount; (vi) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof); (vii)

---

[22]        The Holders of such Claims are sophisticated commercial parties who are party to the RSA and were able to evaluate the tax consequences of the Plan prior to entering into the RSA.

whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (viii) the Holder's method of tax accounting; (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (x) whether the "market discount" rules are applicable to the Holder's Claims.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN TO THEM.

### B.      Tax Consequences to U.S. Holders of Claims

This subsection describes tax consequences to a U.S. Holder.  As used herein, a "U.S. Holder" is a Holder that is, for U.S. federal income tax purposes, a citizen or resident of the U.S. or a domestic corporation or that otherwise is subject to U.S. federal income taxation on a net income basis in respect of a Claim.

### 1.      General

A U.S. Holder will generally recognize gain or loss on the exchange of its Claim for cash in an amount equal to the difference between (i) the amount of cash received by the U.S. Holder (other than consideration attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income).  A U.S. Holder's tax basis in a Claim generally equals the cost of such Claim to such holder, increased by any amounts includible in income by the Holder as original issue discount and market discount and reduced by any amortized premium and any payments other than payments of qualified stated interest made on such Claim.   With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, *see "— Accrued but Unpaid Interest Income with Respect to Claims*" below.

Gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the U.S. Holder and is held for more than one year.  All U.S. Holders should consult their own tax advisors to determine whether their gain or loss will be long-term capital gain or loss and the specific tax effects thereof on them.

A U.S. Holder who purchased a Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a *de minimis* exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 2.       Accrued but Unpaid Interest Income with Respect to Claims

In general, to the extent any amount received by a U.S. Holder is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. All U.S. Holders should consult their own tax advisors regarding the deductibility of unpaid interest for tax purposes.

If the cash received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on its Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that consideration in respect of Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to accrued but unpaid interest. The IRS could, however, take a contrary position. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

## C.       Tax Consequences to Non-U.S. Holders of Claims

This subsection describes tax consequences to a Non-U.S. Holder. A "Non-U.S. Holder" is a beneficial owner of a Claim that is not a U.S. Holder.

### 1.       General

Any gain realized by a Non-U.S. Holder on an exchange of its Claims generally will not be subject to U.S. federal income tax.

### 2.       Accrued but Unpaid Interest Income with Respect to Claims

Subject to the discussions below under "*Information Reporting and Backup Withholding*" and "*FATCA*," payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (*see* "*Tax Consequences to U.S. Holders of Claims—Accrued but Unpaid Interest Income with Respect to Claims*" above) generally will not be subject to U.S. federal income tax or withholding, provided that (i) such interest payment qualifies for the portfolio interest exemption and (ii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person for U.S. federal income tax purposes. If the portfolio interest exemption were not to apply with respect to such payment, the amount of the payment that is attributable to accrued but untaxed interest will generally be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty).

## D.       Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan to a Holder that is not an exempt recipient. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to payments made pursuant to the

Plan unless that Holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded provided that the required information is timely provided to the IRS.

### E.    FATCA

Under the U.S. tax rules known as the Foreign Account Tax Compliance Act ("FATCA"), a Holder may be subject to 30% U.S. withholding tax on distributions or payments under the Plan if the holder is not FATCA compliant, or holds its Claims through a foreign financial institution that is not FATCA compliant. In order to be treated as FATCA compliant, a Holder must provide certain documentation (usually an IRS Form W-8BEN or W-8BEN-E) containing information about its identity, its FATCA status, and if required, its direct and indirect U.S. owners. These requirements may be modified by the adoption or implementation of an intergovernmental agreement between the United States and another country or by future U.S. Treasury Regulations. If any taxes were to be deducted or withheld from any payments in respect of a Claim as a result of a beneficial owner or intermediary's failure to comply with the foregoing rules, no additional amounts will be paid on the Claim as a result of the deduction or withholding of such tax. Each Holder should consult its own tax adviser about how FATCA may apply to its particular situation and circumstances.

### XI.    RECOMMENDATION AND CONCLUSION

[This Disclosure Statement was approved by the Bankruptcy Court after notice and a hearing.] The Bankruptcy Court has determined that this Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan. The Bankruptcy Court's approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

The Debtors believe that Confirmation and Consummation of the Plan is in the best interests of the Debtors, the Estates and their creditors. The Plan provides for an equitable distribution to creditors. The Debtors believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a material reduction in the distributions to Holders of Claims.

## **Exhibit 1**

**Joint Chapter 11 Plan of Reorganization**


**(Filed Separately)**

**<u>Exhibit 2</u>**

**Restructuring Support Agreement**

**(To Be Filed)**